### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**JOHN M. ZAZZERA,**
**PAUL S.  CICCOTTO and**
**RAAMIE B. IBRAHIM,**

      **Plaintiffs,**

  **vs.**                        **Case No.**


**FIRST NATIONAL BANK OF PASCO,**

      **Defendant.**

_____/

### VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, JOHN M. ZAZZERA ("Plaintiff Zazzera"), PAUL S. CICCOTTO ("Plaintiff Ciccotto"), and Plaintiff RAAMIE B. IBRAHIM ("Plaintiff Ibrahim") (collectively, "Plaintiffs") bring this action against Defendant, FIRST NATIONAL BANK OF PASCO ("FNBP" or "Defendant FNBP"), and allege as follows:

### INTRODUCTION

1.     This is an action by Plaintiffs against Defendant FNBP for:  retaliation by all Plaintiffs pursuant to Florida's Private Sector Whistleblower Act ("FWA"), §§ 448.101 – 448.105, Florida Statutes (Count I); and for breach of contract on behalf of Plaintiffs Zazzera, Ciccotto and Ibrahim (Counts II through IV, respectively); with each count seeking damages in excess of $75,000, exclusive of interest, costs,

equitable relief, attorney's fees and court costs. Plaintiffs seek all available and applicable legal remedies under such laws, including but not limited to injunctive and declaratory relief, compensatory damages, punitive damages (if deemed warranted), and recovery of their reasonable attorney's fee and costs if they prevail.

<u>**JURISDICTION**</u>

2.    This action arises under Florida state statute and Florida common law.

3.    This Court has original jurisdiction over all claims by Plaintiffs Ciccotto and Ibrahim against Defendant FNBP based on complete diversity of citizenship as well as the amount in controversy, pursuant to 28 U.S.C. §§ 1332.

4.    This Court has supplemental jurisdiction over the state law claims by Plaintiff Zazzera against Defendant FNBP under 28 U.S.C. § 1367 for Count I because they arise from the same case or controversy as the claim over which this Court has original jurisdiction for Plaintiffs Ciccotto and Ibrahim; and pursuant to the venue clause within the Employment Agreement at issue between them for Count II.

5.     Specifically, pursuant to paragraph 10 of the Employment Agreement between FNBP and Plaintiff Zazzera, "any action relating to or arising

out of this Agreement, shall be the state **or** federal court situated in Pasco County, Florida."

## **VENUE**

6.      The venue of this Court over this controversy is proper based upon 28 U.S.C. § 1391(b)(2) and (d).  Specifically, the events or omissions which give rise to the instant claims transpired occurred within Pasco County, Florida, within this Court's judicial district.

7.      The federal court with jurisdiction over Pasco County is this federal judicial district and division.

8.      Furthermore, the Plaintiffs, none of whom reside within this judicial division, felt the impact of the Defendant FNBP's unlawful employment practices within this jurisdiction.

9.      Defendant FNBP maintains offices in Florida, with its principal corporate office located at 13315 US Highway 301, Dade City, Pasco County Florida, within this judicial district and division.

## **THE PARTIES**

10.      Plaintiff Zazzera is, and was at all times material hereto, a citizen and resident of the State of Florida and Orange County.

11.      Plaintiff  Ciccotto  is, and was at all times material hereto,  a  citizen

and resident of the Commonwealth of Pennsylvania.

12.     Plaintiff Ibrahim is, and was at all times material hereto, a citizen and resident of the State of Illinois.

13.     At all times material hereto, Defendant, FIRST NATIONAL BANK OF PASCO ("Defendant FNBP" or "FNBP"), was and is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A), and is chartered and examined by the Office of the Comptroller of the Currency ("OCC"), established pursuant to 12 U.S.C. § 1, et seq.

14.     At all times material hereto, Defendant FNBP was and is an "insured depository institution" as that term is defined in 12 U.S.C. § 1813(c)(2), and a Federal Deposit Insurance Corporation ("FDIC") insured bank, being chartered in the State of Florida in 1986, having its principal office in Dade City, Florida.

15.     At all times material hereto, Defendant FNBP was and is a wholly owned subsidiary of Florida Bancshares, Inc., a Florida corporation.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

16.     Plaintiff Zazzera was hired as President & CEO of FNBP, pursuant to a two-year Employment Agreement dated December 16, 2024 extended by and executed with Defendant FNBP's Board of Directors of FNBP ("the Board"). In fact, Zazzera actually began working for Defendant the week prior to the executed

contract date (December 16, 2024). A copy of Plaintiff Zazzera's Employment Agreement is attached hereto as Exhibit "**A**" ("Zazzera Agreement").

17.    Plaintiff Zazzera was tasked with leading FNBP through a critical transition during sale negotiations.

18.    Plaintiff Ciccotto was hired on January 2, 2025 (effective retroactively to December 30, 2024), pursuant to a three (3) year employment agreement, as Defendant FNBP's Executive Vice President ("EVP") - Chief Administrative Officer, on behalf of Defendant FNBP.

19.    Plaintiff Ciccotto was hired pursuant to an employment agreement provided by Plaintiff Zazzera, but on behalf of Defendant FNBP and its Board. A copy of Plaintiff Ciccotto's employment contract is attached hereto as Exhibit "**B**" ("Ciccotto Agreement").

20.    Plaintiff Ibrahim was hired on January 10, 2025, as Senior Vice President ("SVP"), Product and Delivery for Defendant FNBP, pursuant to an offer letter/contract provided by Plaintiff Ciccotto, but on behalf of Defendant FNBP and its Board. A copy of Plaintiff Ibrahim's employment contract is attached hereto as Exhibit "**C**" ("Ibrahim Agreement").

21.    In the course of their duties, Plaintiffs uncovered serious malfeasance by the FNBP Board, as well as violations of banking regulations.

22.     FNBP is required to maintain transaction monitoring, including timely Currency Transaction Reports ("CTR's") and Suspicious Activity Reports ("SAR's") filings to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury.

23.     FNBP is also subject to "The Travel Rule," a FinCEN-enforced requirement under the BSA that mandates financial institutions pass specific identifying information about both the sender and recipient to the next financial institution for transactions of $3,000 or more.

24.     Plaintiffs discovered that Defendant FNBP's designated BSA/Anti-Money Laundering ("AML") Officer, Valerie Assad ("Assad") did not maintain adequate oversight or review of transactional activity for FNBP.

25.     Specifically, on June 3, 2025, Plaintiffs Zazzera and Ciccotto, as well as FNBP's Chief Compliance & Risk Officer, Wesley Ward ("Ward"), met with FNBP's Board Chairman, Ander ("A.P.") Gibbs, and Vice Chairman of the Board Paul Midili ("Midili"), who was also Chair of the Directors Loan Committee, ("DLC") over lunch.

26.     At the lunch meeting, Plaintiffs Zazzera and Ciccotto, along with Ward, and armed with information uncovered by them, as well as Plaintiff Ibrahim, discussed an ongoing regulatory examination, pending bank litigation, and several

newly uncovered issues.

27.    Specifically, Plaintiffs Zazzera and Ciccotto, together with FNBP's Chief Compliance & Risk Officer (Ward), presented hard-copy folders with documentary evidence of the foregoing, which included:

a)  Documentary evidence bearing the signatures of FNBP's Board Chair (Gibbs), Vice Chair (Midili), and its current CEO & President, Paula O'Neil ("O'Neil"), illustrating that the DLC had approved an ACH exposure limit of $500 million for a fintech partner—an amount significantly beyond established policy limits and greater than the Bank's total asset size of $300 million;

b)  The materials presented by Plaintiffs included a contract reflecting a $2 million reserve requirement established by FNBP's former Chief Revenue Officer Mike Mashke ("Mashke");

c)  Historical emails revealed that FNBP—along with certain of its Board members and former CEO—were aware that the same fintech partner's ACH activity, totaling 256,000 transactions representing approximately $1.6 billion, was not being monitored through FNBP's BSA/AML system. This oversight subsequently contributed to FNBP being named as a co-defendant in a lawsuit filed against the fintech company,

alleging $10 million in unreimbursed transactions. Although the matter was ultimately settled out of court, proper AML/BSA monitoring would likely have identified the fintech partner's misappropriation of funds much earlier, potentially mitigating FNBP's exposure and reputational risk;

d)  Provided Gibbs and Midili with a letter dated June 2, 2025, prepared with FNBP's counsel and its Chief Compliance Officer (Ward), notifying the OCC that FNBP's designated BSA/AML Officer (Assad), had deleted 6,087 emails containing critical program information.

e)  A loan exceeding $1 million extended to FNBP's Chairman's (Gibbs') daughter without DLC approval and, instead, approved by another FNBP Board member, in violation of Regulation O (12 CFR § 215);

f)  Gibbs pressuring Zazzera, through repeated demands and implied job-related consequence, ultimately to purchase 25,000 shares of his (Gibbs) stock at $20 per share (totaling $500,000), stating the proceeds would fund his (Gibbs') daughter's business; and

g)  FNBP had paid real estate commissions to a company owned by a Vice Chairman, Midili, for selling FNBP-owned real estate.

28.    A two-inch thick packet of supporting documentation was provided by

Plaintiffs Zazzera and Ciccotto to Gibbs and Midili during the meeting corroborating the foregoing facts set forth in paragraph 26, *supra*.

29.    Gibbs instructed that the findings be prepared for presentation at the next FNBP Board meeting, ostensibly illustrating concern.

30.    However, Plaintiffs Zazzera, Ciccotto and Ibrahim were terminated by Gibbs, on behalf of FNBP, with no reason provided, a mere ten (10) days later --- on June 13, 2025, preventing the presentation to FNBP's full Board of Directors.

31.    Upon information and belief, despite Plaintiff Ibrahim not being present at the luncheon presentation on June 3, 2025, Gibbs and Midili, as well as FNBP's Board knew that Plaintiff Ibrahim was instrumental in helping to uncover the matters for which the Plaintiffs "blew the whistle," as they were aware that Plaintiff Ibrahim had taken steps to attempt to rectify the bad acts of FNBP.

## COUNT I

### <u>RETALIATION UNDER FLORIDA'S PRIVATE SECTOR<br>WHISTLEBLOWER ACT<br>(ON BEHALF OF ALL PLAINTIFFS)</u>

32.    This is a cause of action by Plaintiffs Zazzera, Ciccotto and Ibrahim for unlawful retaliation by Defendant FNBP against them brought pursuant to Florida's Private Sector Whistleblower Act ("FWA"), §§ 448.101 – 448.105, Florida Statutes.

33.    Plaintiffs repeat, adopt, and reallege the allegations of paragraphs 1

through 31, as if set forth more fully herein.

34. At all times material hereto, Plaintiffs were employees of Defendant FNBP within the meaning of § 448.101(2) of the FWA.

35. At all times material hereto, Defendant FNBP was an "employer" pursuant to § 448.101(3) of the FWA.

36. By virtue of their actions, as stated in paragraphs 21 through 28 inclusive, *supra*, Plaintiffs both "disclosed…in writing" <u>and</u> "objected to" activities, policies, or practices of their employer, FNBP, that were "in violation of a law, rule, or regulation," within the meaning of § 448.102 (1) and (3) of the FWA.

37. Defendant FNBP took "retaliatory personnel action" against all three Plaintiffs as defined under § 448.101(5) of the FWA; namely, involuntarily terminating the employment of all three Plaintiffs.

38. As a direct and proximate cause of Plaintiffs' participation in the whistleblowing activities identified herein, Plaintiffs have been damaged by Defendant.

39. As a result of Defendant's conduct set forth herein, Plaintiffs are entitled to compensation for any and all lost wages and benefits, and reasonable attorney's fees and costs.

40.    Defendant FNBP engaged in retaliation against Plaintiff with malice and reckless indifference to Plaintiffs' rights.

41.    Plaintiffs have suffered damage to their names, reputations and professional careers, as well as emotional pain and mental anguish as a direct result of Defendant's unlawful retaliation.

42.    Plaintiffs have also suffered pecuniary losses as a direct result of Defendant's unlawful retaliation.

43.    As a result of Defendant's unlawful retaliation, Plaintiffs have suffered and continue to suffer damages.

**WHEREFORE**, Plaintiffs pray for and request that this Court enter judgment against Defendant for:

(a).    Back pay and benefits from the date of their involuntary terminations through the date of trial of this matter;

(b).    Prejudgment interest on the above sum;

(c).    Compensatory damages for emotional anguish, pain and suffering;

(d).    Front pay and future benefits in a sum to be determined by the court;

(d).     Any other non-pecuniary damages found due and owing to

11

Plaintiffs;

(e).    Injunctive relief, if deemed warranted;

(f).    If Plaintiffs prevail in the instant matter, recovery of Plaintiffs' fees and costs under § 448.104, Florida Statutes; and

(g).    Any and all such other and further relief as this Court deems just and equitable.

## COUNT II

### BREACH OF EXPRESS CONTRACT
### (BY PLAINTIFF ZAZZERA)

44.    This is by a cause of action by Plaintiff Zazzera seeking recovery of unpaid monies due under an express contract, i.e., his Employment Agreement, attached hereto as Exhibit "**A**."

45.    This count is pled cumulatively and in the alternative to Count I. Plaintiff Zazzera therefore repeats, adopts, and realleges the allegations of paragraphs 1 through 43, as if set fort more fully herein.

46.    As stated in paragraph 16, Plaintiff Zazzera was hired by and served as President & CEO for Defendant FNBP, pursuant to an Employment Agreement dated December 16, 2024 (See "Zazzera Agreement" attached as Exhibit "**A**").

47.    Plaintiff Zazzera accepted the offer and entered into the Employment Agreement in reliance upon, and under the expectation, that it would be honored.

12

48.    Plaintiff performed services for which he is due the remaining compensation under the Zazzera Agreement.

49.    Defendant FNBP breached the Zazzera Agreement by terminating Zazzera on June 13, 2025 without proper notice as required, and in retaliation for "blowing the whistle."

50.    Defendant terminated the Zazzera Agreement abruptly and without notice, based upon pretextual reasons.

51.    As a result of Defendant FNBP's actions by refusing to pay the remaining sum due under the Zazzera Agreement, Plaintiff Zazzera has incurred financial damage.

**WHEREFORE,** Plaintiff Zazzera prays for and requests that this Court enter judgment against Defendant for:

(a).    All damages found to be due and owing Plaintiff Zazzera under the express Agreement (Exhibit "A");

(b).    Prejudgment interest;

(c).    If he prevails, recovery of his reasonable costs and expenses, including his attorneys' fees under paragraph 14 of the Zazzera Agreement, and/or to the extent the sum found due and owing is determined to be wages, for which Plaintiff Zazzera is entitled to

13

recover his reasonable costs and attorney's fees, if deemed the prevailing party, pursuant to §448.08, Florida Statutes; and

(d).    Any and all such other and further relief as this Court deems just and equitable.

## COUNT III

## BREACH OF EXPRESS CONTRACT
## (BY PLAINTIFF CICCOTTO)

52.    This is by a cause of action by Plaintiff Ciccotto seeking recovery of unpaid monies due under an express contract, i.e., his employment contract attached hereto as Exhibit "**B**" ("Ciccotto Agreement").

53.    This count is pled cumulatively and in the alternative to Count I. Plaintiff Ciccotto therefore repeats, adopts, and realleges the allegations of paragraphs 1 through 43, as if set forth more fully herein.

54.    As stated in paragraphs 18 and 19, Plaintiff Ciccotto was hired by and served as Defendant FNBP's Executive Vice President ("EVP") - Chief Administrative Officer, pursuant to a three (3) year employment agreement on January 2, 2025 (effective retroactively to December 30, 2024) (See "Ciccotto Agreement" attached as Exhibit "B").

55.    Plaintiff Ciccotto accepted the offer and entered into the employment agreement in reliance upon, and under the expectation, that it would be honored.

14

56. Plaintiff Ciccotto performed services for which he is due the remaining compensation under the Ciccotto Agreement.

57. Defendant FNBP breached the Ciccotto Agreement by terminating Ciccotto on June 13, 2025 in retaliation for "blowing the whistle."

58. Defendant terminated the Ciccotto Agreement abruptly and without notice, based upon pretextual reasons.

59. As a result of Defendant FNBP's actions by refusing to pay the remaining sum due under the Ciccotto Agreement, Plaintiff has incurred financial damage.

**WHEREFORE,** Plaintiff Ciccotto prays for and requests that this Court enter judgment against Defendant for:

(a). All damages found to be due and owing Plaintiff Ciccotto under the express Agreement (Exhibit "B");

(b). Prejudgment interest;

(c). To the extent the sum found due and owing is determined to be wages, for which Plaintiff Ciccotto is entitled to recover his reasonable costs and attorney's fees if deemed the prevailing party, pursuant to §448.08, Florida Statutes, recovery of same; and

(d).     Any and all such other and further relief as this Court deems just and equitable.

## COUNT IV

### BREACH OF EXPRESS CONTRACT
### (BY PLAINTIFF IBRAHIM)

60.     This is by a cause of action by Plaintiff Ibrahim seeking recovery of unpaid monies due under an express contract, i.e., his employment contract attached hereto as Exhibit "**C**" ("Ibrahim Agreement").

61.     This count is pled cumulatively and in the alternative to Count I. Plaintiff Ibrahim therefore repeats, adopts, and realleges the allegations of paragraphs 1 through 43, as if set fort more fully herein.

62.     As stated in paragraph 20, Plaintiff Ibrahim was hired on January 10, 2025, as Senior Vice President ("SVP"), Product and Delivery for Defendant FNBP, pursuant to an offer letter/contract provided by Plaintiff Ciccotto, but on behalf of Defendant FNBP and its Board. (See "Ibrahim Agreement" attached as Exhibit "C").

63.     Plaintiff Ibrahim accepted the offer and entered into the employment agreement in reliance upon, and under the expectation, that it would be honored.

64.     Plaintiff Ibrahim performed services for which he is due the remaining compensation under the Ibrahim Agreement.

65.    Defendant FNBP breached the Ibrahim Agreement by terminating Ciccotto on June 13, 2025 in retaliation for "blowing the whistle."

66.    Defendant terminated the Ibrahim Agreement abruptly and without notice, based upon pretextual reasons.

67.    As a result of Defendant FNBP's actions by refusing to pay the remaining sum due under the Ibrahim Agreement, Plaintiff has incurred financial damage.

**WHEREFORE,** Plaintiff Ibrahim prays for and requests that this Court enter judgment against Defendant for:

(a).    All damages found to be due and owing Plaintiff Ibrahim under the express Agreement (Exhibit "C");

(b).    Prejudgment interest;

(c).    To the extent the sum found due and owing is determined to be wages, for which Plaintiff Ibrahim is entitled to recover his reasonable costs and attorney's fees if deemed the prevailing party, pursuant to §448.08, Florida Statutes, recovery of same; and

(d).    Any and all such other and further relief as this Court deems just and equitable.

## RESERVATION OF RIGHTS

Plaintiffs Zazzera, Ciccotto and Ibrahim reserve the right to amend this Verified Complaint and seek punitive damages upon a proper showing of evidence of same.

## DEMAND FOR JURY TRIAL

Plaintiffs Zazzera, Ciccotto and Ibrahim hereby demand a trial by jury on all issues so triable.

DATED this <u>11th</u> day of February, 2026.

Respectfully submitted,
<u>s/ Gary D. Wilson</u>
Gary D. Wilson, Esq.
Florida Bar No. 846406
WILSON MCCOY, P.A.
932 N. Maitland Ave.
Maitland, FL 32751
Telephone: (407) 803-5400
Facsimile: (407) 803-4617
E-mail: gwilson@wilsonmccoylaw.com
Attorneys for Plaintiffs
**John M. Zazzera**
**Paul S. Ciccotto** and
**Raamie B. Ibrahim**

18

## VERIFICATION

Personally appeared before the undersigned, JOHN M. ZAZZERA, who being first duly sworn, deposes and says that the allegations of this Verified Complaint, consisting of paragraphs 1 through 51, inclusive, are true and correct to the best of his knowledge, information and belief.

_____
JOHN M. ZAZZERA

STATE OF FLORIDA     )
COUNTY OF ORANGE )

The foregoing instrument was acknowledged before me this __11th__ day of __Feburary__, 2026, by John M. Zazzera, who is personally known to me or who has produced ____Driver License____ as identification, and who did take an oath.

Notary Public State of Florida
Karen Aimee Baez Antigua
My Commission  HH 344212
Expires 12/26/2026

_____
Notary Public – State of Florida at Large

My Commission Expires: __12/26/2026__

## VERIFICATION

Personally appeared before the undersigned, PAUL S. CICCOTTO, who being first duly sworn, deposes and says that the allegations of this Verified Complaint, consisting of paragraphs 1 through 43, and 52 through 59, inclusive, are true and correct to the best of his knowledge, information and belief.

_____
PAUL S. CICCOTTO

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF Bucks                     )

The foregoing instrument was acknowledged before me this 11th day of Febrocy_____, 2026, by Paul S. Ciccotto, who is personally known to me or who has produced ___PA DL_____ as identification, and who did take an oath.

_____
Notary Public – State of Pennsylvania at Large

My Commission Expires: 12/05/2026

Commonwealth of Pennsylvania - Notary Seal
STEPHANIE L MCCORRISTON, Notary Public
Bucks County
My Commission Expires December 5, 2026
Commission Number 1343684

## VERIFICATION

Personally appeared before the undersigned, RAAMIE B. IBRAHIM, who being first duly sworn, deposes and says that the allegations of this Verified Complaint, consisting of paragraphs 1 through 52 and 69 through 76, inclusive, are true and correct to the best of his knowledge, information and belief.

_____
RAAMIE B. IBRAHIM

STATE OF ILLINOIS    )
COUNTY OF Winnebago  )

The foregoing instrument was acknowledged before me this 11th day of February, 2026, by Raamie B. Ibrahim, who is personally known to me or who has produced IL Driver's license as identification, and who did take an oath.

_____
Notary Public – State of Florida at Large

My Commission Expires:___01-16-30___

OFFICIAL SEAL
CYNTHIA MICHELLE YANEZ
Notary Public, State of Illinois
Commission No. 1024105
My Commission Expires January 16, 2030

24

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into this 16th day of December 2024 by and between First National Bank of Pasco, a national banking association (the "Bank") and John Zazzera (the "Employee").

WHEREAS, Employee and the Bank desire for Employee to serve as President and Chief Executive Officer of the Bank commencing on and continuing after the date hereof subject to and upon the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing and of the mutual representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, do undertake, promise, covenant and agree with each other as follows:

## AGREEMENT:

In consideration of the above premises and the mutual agreements hereinafter set forth, effective as of the Effective Date, the parties hereby agree as follows:

1. **Duties.**

    **1.1**    **Position.**  The Employee shall be employed during the Term (as defined below) as the President and Chief Executive Officer of the Bank.  The Employee shall perform and discharge: (a) the usual and customary duties and responsibilities commensurate with similar positions at other financial institutions similar in operation and size; and (b) such additional duties and responsibilities as may be assigned to the Employee from time to time by the Board of Directors of the Bank (the "Board") in connection with the conduct of the Employee's duties for the Bank (provided such additional duties and responsibilities remain commensurate with similar positions at other financial institutions similar in operation and size).

    **1.2**    **Full-Time Status.** The Employee shall: (a) devote substantially all of the Employee's business time, energy, and skill during regular business hours each week to the performance of the duties of the Employee's employment (reasonable vacations, reasonable absences due to illness and other authorized absences excepted) and shall not, during the Term, be engaged (whether or not during normal business hours) in any other significant business or professional activity, whether or not such activity is pursued for gain, profit, or other pecuniary advantage, that would have a material adverse effect on the Employee's duties with the Bank; and (b) follow all reasonable and lawful management policies and decisions communicated to the Employee by the Board. Nothing herein shall prevent Employee from (x) investing the Employee's personal assets in any manner which will not require any material services on the part of the Employee in the operation or affairs of the entity and in which the Employee's participation is solely that of an investor; provided that such investment activity following the Effective Date shall not result in Employee owning beneficially at any time five percent (5%) or more of the equity securities of any firm, corporation, joint venture, or other business (the Bank, its parent holding company, or any Affiliate) that is engaged in the Business; or (y) participating in civic and professional affairs and organizations and conferences, preparing or publishing papers or books, or teaching or serving on the board of directors of an entity; provided further, that the Board may direct the Employee in writing to resign from any such organization and/or cease such activities should the Board reasonably concludes that continued membership and/or activities of the type identified would be materially adverse to the Bank's reputation, or materially adverse to the Employee's position at, or materially interfere with the Employee's duties with, the Bank.

**1.3** **Principal Place of Employment.** Except as otherwise provided in this Section 1.3, the Employee shall perform Employee's duties and responsibilities at the office of the Bank located in Dade City, Florida (the "Principal Location"), or, with prior approval from the Board, such other office of the Bank from which the Employee desires to perform Employee's duties and responsibilities (such other location, if any, also referred to as the "Principal Location").

**2.** **Term.** This Agreement shall become effective on the Effective Date and will expire on the third (3rd) anniversary of the Effective Date, unless earlier terminated as provided herein (such period referred to as the "Term"). In the event of termination of this Agreement (and therefore employment hereunder) by any party, no party shall have any further obligation to any other party, except as specifically provided in this Agreement..

**3.** **Compensation.** The Bank shall provide the Employee with the following pay and benefits during the Term, except as otherwise provided below.

**3.1** **Annual Base Salary.** The Bank shall pay to the Employee an annual base salary of no less than Three Hundred Fifty Thousand Dollars ($350,000) per year (the "Annual Base Salary"). The Employee's Annual Base Salary shall be reviewed at least annually, and may be increased (but not decreased) from such amount, as determined by the Board based upon an evaluation of the Employee's performance. Any such increase to the Employee's Annual Base Salary then shall become the Employee's Annual Base Salary for purposes of this Agreement. The Employee's Annual Base Salary shall be payable in accordance with the Bank's normal payroll practices (no less frequently than monthly).

**3.2** **Incentive Compensation.** The Employee shall be eligible to receive annual bonus compensation at the discretion of the Board.

**3.3** **Business and Professional Education Expenses.** Subject to the reimbursement policies from time to time adopted by the Board and consistent with the annual budget approved for the period during which an expense was incurred, the Bank agrees to reimburse the Employee for reasonable business expenses incurred by the Employee in the performance of Employee's duties hereunder. All expenses eligible for reimbursements described in this Agreement must be incurred by the Employee while the Employee remains employed with the Bank to be eligible for reimbursement. The amount of reimbursable expenses incurred in one taxable year shall not affect the amount of expenses eligible for reimbursement in any other taxable year. Rights to reimbursement are not subject to liquidation or exchange for other benefits. As a condition of any such expense reimbursement, the Employee must submit verification of the nature and amount of such expenses in accordance with such reimbursement policies, and in sufficient detail to comply with rules and regulations promulgated by the United States Treasury Department. The Bank shall pay such reimbursement within a reasonable time period after the Employee submits such verification.

**3.4** **Paid Leave.** The Employee shall be entitled to four weeks of paid leave, to be taken in accordance with the Bank's paid leave policies as in effect from time to time.

**3.5** **Automobile Allowance.** The Bank shall pay to the Employee a monthly automobile allowance of One Thousand Six Hundred Dollars ($1,600) per month.

**3.6** **Country Club Dues.** The Bank shall reimburse Employee for up to One Thousand One Hundred ($1,100) per month for dues at a country club mutually agreed upon by the Bank and the Employee.

2

**3.7    Benefits.**  In addition to the benefits specifically described in this Agreement, the Employee shall be entitled to such benefits as may be available from time to time to similarly situated employees (on a basis not less favorable than that provided to the class of employees in which the Employee is a member), subject to eligibility requirements and terms and conditions of each such plan. All such benefits shall be awarded and administered in accordance with the written terms of any applicable benefit plan or, if no written terms exist, the Bank's standard policies and practices relating to such benefit. Nothing herein shall limit the ability of the Bank to amend, modify or terminate any such benefit plans, policies or programs at any time and from time to time, provided such amendment, termination or modification applies substantially the same for all similarly-situated employees.

**3.8    Withholding.**  The Bank may each deduct from each payment of compensation hereunder all amounts required to be deducted and withheld in accordance with applicable federal and state income, FICA, and other withholding requirements.

**4.    Termination; Suspension or Reduction of Benefits.**

**4.1    Termination.**

(a)    Death or Disability.

(i)    The Employee's employment and this Agreement shall terminate automatically upon the Employee's death.

(ii)    The Employee's employment and this Agreement shall terminate immediately upon written notice to the other party by any of the Bank or Employee if such party determines in good faith that the Disability of the Employee has occurred during the Term.

(b)    Termination by Bank.  The Bank may terminate the Employee's employment and this Agreement during the Term (i) with Cause immediately on written notice to the Employee, (ii) without Cause by delivering a written notice in the manner contemplated by Section 7; or (iii) for any or no reason during the first six months of the Term.

(c)    Termination by Employee.  The Employee's employment and this Agreement may be terminated by the Employee for any reason or no reason, or by Good Reason, by delivering a written notice in the manner contemplated by Section 7.

(d)    Change in Control. This Agreement, but not Employee's employment, shall terminate upon a Change in Control

**4.2    Effect of Termination.**

(a)    Termination of Employment by the Bank during the first six months of the Term or for Cause, by the Employee other than for Good Reason, or due to the Employee's death, or Disability.  If, during the Term, the Employee's employment is terminated (i) by the Bank for Cause, (i) by the Employee other than for Good Reason, (or (iii) due to the Employee's death or Disability, the Employee shall be entitled to receive from the Bank (a) all Annual Base Salary earned or accrued through the date Employee's employment is terminated, (b) reimbursement for any and all reasonable and necessary business expenses incurred by Employee through the date Employee's employment is terminated, and (c) all other vested payments and vested benefits, including both cash and stock components, to which Employee may be entitled under the terms of

any other applicable compensation arrangement or benefit plan or program of the in which the Employee participates, including any earned and accrued, but unused paid time off pursuant to Bank policies (collectively, the "Accrued Benefits"). The Accrued Benefits will be paid to the Employee in a lump sum as soon as administratively practicable (and no later than thirty (30) days) after the Employee's termination of employment, except that any and all other vested payments and vested benefits to which the Employee may be entitled under the terms of any other applicable compensation arrangement or benefit plan or program of the Bank in which the Employee participates will be paid in accordance with the terms of such other applicable compensation arrangement or benefit plan or program.

(b)    <u>Termination of Employment due to a Change in Control, by the Bank other than for Cause, or by the Employee for Good Reason.</u> If, during the Term, (i) Employee's employment is terminated due to a Change in Control, (ii) the Bank terminate the Employee's employment other than for Cause, or (iii) the Employee terminates employment due to Good Reason (which shall not include in either case any termination on account of the Employee's death or Disability), as long as Employee does not violate the provisions of <u>Section 5</u> hereof, the Employee shall be entitled to receive from the Bank, except as otherwise described in <u>Section 4.2(c) and (d)</u> below, (a) the Accrued Benefits to be paid as described in <u>Section 4.2(a)</u> above, and (b) payment of an amount equal to the Employee's Annual Base Salary in effect immediately preceding the date of the Employee's termination of employment (or, if greater, the Employee's Annual Base Salary in effect immediately preceding any action by the Bank for which the Employee has terminated employment for Good Reason) (the "Severance"), payable in one lump sum within fifteen (15) days following the date the Employee executes the Release Agreement described below and all revocation periods thereunder have expired.

(c)    <u>Release</u>. The Bank shall not be obligated to commence or make any payment or provide any benefit described in <u>Section 4.2(b)</u> (other than the Accrued Benefits) unless (i) within sixty (60) days after the date of Employee's termination of employment, the Employee shall have executed a separation agreement containing a full general release of claims and covenant not to sue relating to the Employee's employment and termination thereof, in the form customarily provided by the Bank for similar employees and reasonably acceptable to the Employee (the "Release Agreement") and such Release Agreement shall not have been revoked within any revocation period specified in the Release Agreement. Any payment to be made or benefit to be provided prior to the Release becoming effective and irrevocable shall be delayed until the date the Release becomes effective and irrevocable and then paid or delivered no later than thirty (30) days after the Release becomes effective and irrevocable. If such sixty (60)-day period spans more than one calendar year, no payment shall be made or benefits delivered any earlier than the subsequent calendar year.

(d)    <u>Potential Delay in Payment under Section 409A.</u> Notwithstanding any provision in the Agreement to the contrary, to the extent necessary to avoid the imposition of tax on the Employee under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") any payments that are otherwise payable, or benefits to be provided, to the Employee within the first six (6) months following the date of Employee's termination of employment shall be suspended and paid or provided as soon as practicable following the end of the six-month period following the date of Employee's termination of employment or, if earlier, after the Employee's death, if, immediately prior to the Employee's termination of employment, the Employee is determined to be a "specified employee" (within the meaning of Code Section 409A(a)(2)(B)(i)) of the Bank (or any related "service recipient" within the meaning of Code Section 409A and the regulations thereunder). Any payments or benefits suspended by operation of the foregoing

4

sentence shall be paid as a lump sum or provided or reimbursed within thirty (30) days following the end of such six-month period or, if earlier, the Employee's death.

**4.3    Regulatory Action.**

(a)    FDIC Golden Parachute Limitations. Notwithstanding anything contained in this Agreement to the contrary, no payments shall be made pursuant to Section 4 or any other provision herein or otherwise in contravention of the requirements of Section 18(k) of the Federal Deposit Insurance Act (the "FDIA") (12 U.S.C. 1828(k)) and Part 359 of the FDIC Rules and Regulations, 12 C.F.R. 359 (collectively, the "FDIC Golden Parachute Restrictions"). In the event any such payments become due and payable under this Agreement at a time when such payments would constitute "golden parachute payments," other than "golden parachute payments" for which the concurrence or consent of the appropriate federal banking agency has been received as contemplated by the FDIC Golden Parachute Restrictions, the obligation on the part of the Bank to make any such payments shall become null and void until, if applicable, such payments otherwise can be made. In addition, nothing in the preceding sentence shall impose an obligation on the part of the Bank to petition the FDIC (and/or other regulatory agency having jurisdiction over the Bank) for its concurrence or consent.

(b)    Other Regulatory Limitations. If the Employee is removed from office and/or permanently prohibited from participating in the conduct of the affairs of any depository institution by an order issued under Section 8(e) or 8(g) of the FDIA (12 U.S.C. 1818(e) and (g)), the Bank shall have the right to terminate all obligations of the Bank under this Agreement as of the effective date of such order, except for the payment of Annual Base Salary due and owing as of the effective date of said order, reimbursement under of expenses incurred as of the date of Employee's termination of employment, and, subject to non-objection of the FDIC (and/or other regulatory agency having jurisdiction over the Bank) any vested payments and vested benefits, including both cash and stock components, to which Employee may be entitled under the terms of any other applicable compensation arrangement or benefit plan or program of the Bank, including any earned and accrued, but unused paid time off pursuant to Bank policies. If the Employee is suspended from office and/or temporarily prohibited from participating in the conduct of the Bank's affairs by a notice served under Section 8(e) or 8(g) of the FDIA (12 U.S.C. 1818(e) and (g)), the Bank shall have the right to suspend all obligations of the Bank under this Agreement as of the date of service, unless stayed by appropriate proceedings. If the charges in the notice are dismissed, the Bank shall reinstate prospectively (in whole or in part) any of its obligations which were suspended. If the FDIC is appointed receiver or conservator under Section 11(c) of the FDIA (12 U.S.C. 1821(c)) of the Bank, the Bank shall have the right to terminate all obligations of the Bank under this Agreement as of the date of such receivership or conservatorship, other than any rights of the Employee that vested prior to such appointment. If the Bank is in default (as defined in Section 3(x)(1) of the FDIA), all obligations under this Agreement shall terminate as of the date of default, but the vested rights of the parties shall not be affected. If the FDIC provides open bank assistance under Section 13(c) of the FDIA (12 U.S.C. 1823(c)) to the Bank, but excluding any such assistance provided to the industry generally, the Bank shall have the right to terminate all obligations of the Bank under this Agreement as of the date of such assistance, other than any rights of the Employee that vested prior to the FDIC action. If the FDIC requires a transaction under Section 13(f) or 13(k) of the FDIA (12 U.S.C. 1823(f) and (k)) by the Bank, the Bank shall have the right to terminate all obligations of the Bank under this Agreement as of the date of such transaction, other than any rights of the Employee that vested prior to the transaction. Notwithstanding the foregoing provisions of this Section 4.3(b), any vested rights of the Employee may be subject to such modifications that are consistent with the authority of the FDIC.

(c)      Regulatory Approval. No payments that otherwise remain payable under this Agreement shall be made or commence, as applicable, that require the concurrence or consent of the appropriate federal banking agency of the Bank pursuant to 12 C.F.R. Section 359 prior to the receipt of such concurrence or consent. Any payments suspended by operation of this Section 4.3(c) shall be paid as a lump sum within thirty (30) days following receipt of the concurrence or consent of the appropriate federal banking agency of the Bank or as otherwise directed by such federal banking agency.

(d)      Other Banking Limitations. All obligations under this Agreement are further subject to such conditions, restrictions, limitations and forfeiture provisions as may separately apply pursuant to any applicable federal banking laws.

## 5.      **Restrictive Covenants.**

### 5.1      **Acknowledgments.**

(a)      Condition of Employment and Other Consideration. The Employee acknowledges and agrees that Employee has received, and will continue during employment to receive, good and valuable consideration for entering into this Agreement, including, without limitation, access to and use of Bank's Confidential Information and access to the Bank's customer and employee relationships and goodwill, and further acknowledges that the Bank would not employ or continue to employ the Employee in the absence of Employee's execution of and compliance with this Agreement.

(b)      Access to Confidential Information, Relationships, and Goodwill. The Employee acknowledges and agrees that Employee is being provided and entrusted with Confidential Information, including highly confidential customer information that is subject to extensive measures to maintain its secrecy within the Bank, is not known in the trade or disclosed to the public, and would materially harm the Bank's legitimate business interests if it was disclosed or used in violation of this Agreement. The Employee also acknowledges and agrees that Employee is being provided and entrusted with access to the Bank's customer and employee relationships and goodwill. The Employee further acknowledges and agrees that the Bank would not provide access to the Confidential Information, customer and employee relationships, and goodwill in the absence of the Employee's execution of and compliance with this Agreement. The Employee further acknowledges and agrees that the Bank's and the Employee's Confidential Information, customer and employee relationships, and goodwill are valuable assets of the Bank and are legitimate business interests that are properly subject to protection through the covenants contained in this Agreement.

(c)      Potential Unfair Competition. The Employee acknowledges and agrees that as a result of Employee's employment with the Bank, Employee's knowledge of and access to Confidential Information, and Employee's relationships with the Bank's customers and employees, the Employee would have an unfair competitive advantage if the Employee were to engage in activities in violation of this Agreement.

(d)      No Undue Hardship. The Employee acknowledges and agrees that, in the event that Employee's employment with the Bank terminates, the Employee possesses marketable skills and abilities that will enable the Employee to find suitable employment without violating the covenants set forth in this Agreement.

6

(e) <u>Voluntary Execution.</u> The Employee acknowledges and affirms that Employee is executing this Agreement voluntarily, that Employee has read this Agreement carefully and had a full and reasonable opportunity to consider this Agreement (including an opportunity to consult with legal counsel), and that Employee has not been pressured or in any way coerced, threatened or intimidated into signing this Agreement.

**5.2** **Restriction on Disclosure and Use of Confidential Information.** The Employee agrees that the Employee shall not, directly or indirectly, use any Confidential Information on the Employee's own behalf or on behalf of any person other than Bank, or reveal, divulge, or disclose any Confidential Information to any person not expressly authorized by the Bank to receive such Confidential Information. This obligation shall remain in effect for as long as the information or materials in question retain their status as Confidential Information. The Employee further agrees that Employee shall fully cooperate with the Bank in maintaining the Confidential Information to the extent permitted by law. The parties acknowledge and agree that this Agreement is not intended to, and does not, alter either the Bank's rights or the Employee's obligations under any state or federal statutory or common law regarding trade secrets and unfair trade practices. Anything herein to the contrary notwithstanding, the Employee shall not be restricted from disclosing information that is required to be disclosed by law, court order or other valid and appropriate legal process; provided, however, that in the event such disclosure is required by law, the Employee, to the extent reasonably practicable, shall provide the Bank with prompt notice of such requirement so that the Bank may seek an appropriate protective order prior to any such required disclosure by the Employee.

**5.3** **Non-Competition.** The Employee agrees that, during the Employee's employment with the Bank as well as for one (1) year after the Employee's termination of employment ("Restricted Period"), Employee will not, without prior written consent of the Bank, directly or indirectly (a) carry on or engage in the Business within the geographic areas consisting of a twenty (20) mile radius from any office of the Bank in existence and operating during the term of Employee's employment with the Bank, or, if Employee's employment with the Bank has been terminated, as of the date Employee's employment with the Bank is terminated (collectively, the "Restricted Territory") on Employee's own or on behalf of any person or any principal, owner, partner, shareholder, joint venturer, investor, member, trustee, director, officer, manager, employee, agent, representative, or consultant of any person, or (b) own, manage, operate, join, control or participate in the ownership, management, operation or control, of any business, whether in corporate, proprietorship or partnership form or otherwise where such business is engaged in the Business within the Restricted Territory. Nothing herein shall prevent Employee from (x) investing the Employee's personal assets in any manner which will not require any material services on the part of the Employee in the operation or affairs of the entity and in which the Employee's participation is solely that of an investor; provided that such investment activity shall not result in Employee owning beneficially at any time five percent (5%) or more of the equity securities of any firm, corporation, joint venture, or other business (other than the Bank or any Affiliate) that is engaged in the Business. The Employee acknowledges that the Restricted Territory is reasonable.

**5.4** **Non-Solicitation of Protected Customers.** The Employee agrees that, during the Restricted Period, Employee shall not, without the prior written consent of the Bank, directly or indirectly, on Employee's own behalf or as a principal, owner, partner, shareholder, joint venturer, investor, member, trustee, director, officer, manager, employee, agent, representative, or consultant of any person, solicit, divert, take away, or attempt to solicit, divert, or take away a Protected Customer for the purpose of engaging in the Business. Nothing in this Section 5.4 shall prohibit general advertising or general solicitation not specifically directed at Bank customers.

**5.5** **Non-Recruitment of Employees.** The Employee agrees that, during the Restricted Period, Employee shall not, without the prior written consent of the Bank, directly or indirectly, whether on

Employee's own behalf or as a principal, owner, partner, shareholder, joint venturer, investor, member, trustee, director, officer, manager, employee, agent, representative, or consultant of any person, recruit, solicit, induce, or attempt to recruit, solicit or induce any employee of the Bank as of the date of termination of Employee's employment with the Bank to terminate such employee's employment or other relationship with the Bank or to enter into employment or any other kind of business relationship with the Employee or any other person. Nothing in this Section 5.5 shall prohibit general advertising or general solicitation not specifically directed at Bank employees.

    **5.6**    **Return of Materials.** The Employee agrees that the Employee will not retain or destroy (except as set forth below), and will return to the Bank within seven (7) days after the date of Employee's termination of employment, or as soon as practicable following any other time the Bank requests such return, any and all property of the Bank or an Affiliate that is in the Employee's possession or subject to the Employee's control, including, but not limited to, customer files and information, papers, drawings, notes, manuals, specifications, designs, devices, code, email, documents, diskettes, CDs, tapes, keys, access cards, credit cards, identification cards, personal items or equipment, computers, mobile devices, other electronic media, all other files and documents relating to the Bank or any Affiliate and its business (regardless of form, but specifically including all electronic files and data of the Bank or any Affiliate), together with all Protected Works and Confidential Information belonging to the Bank or that the Employee received from or through Employee's employment with the Bank. The Employee will not make, distribute, or retain copies of any such information or property. To the extent that the Employee has electronic files or information in Employee's possession or control that belong to the Bank or any Affiliate, contain Confidential Information, or constitute Protected Works (specifically including but not limited to electronic files or information stored on personal computers, mobile devices, electronic media, or in cloud storage), within seven (7) days after the date of Employee's termination of employment, or as soon as practicable following any other time the Bank requests, the Employee shall (a) provide the Bank with an electronic copy of all of such files or information (in an electronic format that readily accessible by the Bank); (b) after doing so, delete all such files and information, including all copies and derivatives thereof, from all non-Bank-owned computers, mobile devices, electronic media, cloud storage, and other media, devices, and equipment, such that such files and information are permanently deleted and irretrievable; and (c) provide a written certification to the Bank that the required deletions have been completed and specifying the files and information deleted and the media source from which they were deleted.

    **5.7**    **Non-disparagement**. The Employee agrees that during the Term and the Restricted Period, the Employee will not make any statement (written or oral) that could reasonably be perceived as disparaging to the Bank or any person or entity that the Employee reasonably should know is an Affiliate of the Bank. The Bank each agree that during the Term and the Restricted Period, it shall instruct its directors and officers, and the directors and officers of each of its Affiliates, to not make any statement (written or oral) that could reasonably be perceived as disparaging to the Employee. Nothing contained in this Section 5.7 is intended to prevent any person from (a) complying with the requirements and policies of any federal or state agency, (b) cooperating with any investigation or request for information from any state or federal government agency, or (c) testifying truthfully in any legal or administrative proceeding.

    **5.8**    **Enforcement of Restrictive Covenants.**

        (a)    <u>Rights and Remedies Upon Breach.</u> The parties specifically acknowledge and agree that the remedy at law for any breach of the Restrictive Covenants will be inadequate, and that in the event the Employee breaches, or threatens to breach, any of the Restrictive Covenants, the Bank shall have the right and remedy, without the necessity of proving actual damage, to enjoin, preliminarily and permanently, the Employee from violating or threatening to violate the Restrictive Covenants and to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Restrictive

Covenants would cause irreparable injury to the Bank and that money damages would not provide an adequate remedy to the Bank. The Employee understands and agrees that if Employee violates any of the obligations set forth in the Restrictive Covenants, the period of restriction applicable to each obligation violated shall cease to run during the pendency of any litigation over such violation, provided that such litigation was initiated during the period of restriction. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Bank at law or in equity. In addition to any other remedies, the Employee agrees that any violation of the covenants in Section 5 will result in the immediate forfeiture of any remaining payment that otherwise is or may become due under Section 4.2(b) (other than the Accrued Benefits). The Employee further agrees that should Employee breach any of the covenants contained in Section 5, the Employee shall repay to the Bank any amounts previously received by the Employee pursuant to Section 4.2(b) (other than the Accrued Benefits), if and as applicable, that are attributable to that portion of the payments paid for the period during which the Employee was in breach of any of the covenants. If the parties become involved in legal action regarding the enforcement of the Restrictive Covenants, the prevailing party will be entitled, in addition to any other remedy, to recover from the other party its reasonable costs and attorneys' fees incurred in enforcing or defending against such covenants. The Bank's ability to enforce its rights under the Restrictive Covenants or applicable law against the Employee shall not be impaired in any way by the existence of a claim or cause of action on the part of the Employee based on, or arising out of, this Agreement or any other event or transaction.

(b)     Severability and Modification of Covenants. The Employee acknowledges and agrees that each of the Restrictive Covenants is reasonable and valid in time and scope and in all other respects. The parties agree that it is their intention that the Restrictive Covenants be enforced in accordance with their terms to the maximum extent permitted by law. Each of the Restrictive Covenants shall be considered and construed as a separate and independent covenant. Should any part or provision of any of the Restrictive Covenants be held invalid, void, or unenforceable, such invalidity, voidness, or unenforceability shall not render invalid, void, or unenforceable any other part or provision of this Agreement or such Restrictive Covenant. If any of the provisions of the Restrictive Covenants should ever be held by a court of competent jurisdiction to exceed the scope permitted by the applicable law, such provision or provisions shall be automatically modified to such lesser scope as such court may deem just and proper for the reasonable protection of the Bank's legitimate business interests and may be enforced by the Bank to that extent in the manner described above and all other provisions of this Agreement shall be valid and enforceable.

(c)     Survival. The obligations of the Employee pursuant to Section 5 shall survive the Employee's Termination hereunder for the period designated under, or the period otherwise necessary to give effect to, Section 5.

**5.9     Disclosure of Agreement.** The Employee acknowledges and agrees that, during the Restricted Period, Employee will disclose the existence and terms of this Agreement to any prospective employer, business partner, investor, or lender prior to entering into an employment, partnership, or other business relationship with such prospective employer, business partner, investor, or lender. The Employee further agrees that the Bank shall have the right to make any such prospective employer, business partner, investor, or lender of the Employee aware of the existence and terms of this Agreement.

**6.     No Set-Off.** The existence of any claim, demand, action, or cause of action by the Employee against any other party hereto whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by any party hereto of any of its rights hereunder.

9

7.    **Notice.** All notices, requests, waivers, and other communications required or permitted hereunder shall be in writing and shall be either personally delivered, sent by reputable overnight courier service or mailed by first class mail, return receipt requested, to the recipient at the address below indicated:

|   |   |
|---|---|
| If to the Bank: | First National Bank of Pasco |
|   | Attn: Chairman of the Board |
|   | 13315 U.S. Hwy 301 |
|   | Dade City, Florida 33525 |
|   |   |
| If to the Employee: | *On file with the Bank* |

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party. All such notices, requests, waivers and other communications shall be deemed to have been effectively given: (a) when personally delivered to the party to be notified; (b) two (2) business days after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified as set forth above with next-business-day delivery guaranteed; or (c) five (5) business days after deposit in the United States Mail postage prepaid by certified or registered mail with return receipt requested at any time other than during a general discontinuance of postal service due to strike, lockout, or otherwise (in which case such notice, request, waiver or other communication shall be effectively given upon receipt) and addressed to the party to be notified as set forth above. A party may change its or Employee's notice address given above by giving the other party ten (10) days' written notice of the new address in the manner set forth above.

8.    **Assignment.** The Agreement is a personal contract and the rights and interest of the parties hereto may not be assigned.

9.    **Waiver.** A waiver by one party to this Agreement of any breach of this Agreement by any other party to this Agreement shall not be effective unless in writing, and no waiver shall operate or be construed as a waiver of the same or another breach on a subsequent occasion.

10.    **Applicable Law; Forum Selection; Consent to Jurisdiction.** The Bank and the Employee agree that this Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Florida without giving effect to its conflicts of law principles. The Employee agrees that the exclusive forum for any action to enforce this Agreement, as well as any action relating to or arising out of this Agreement, shall be the state or federal court situated in Pasco County, Florida. With respect to any such court action, each of the Employee and the Bank hereby (a) irrevocably submits to the personal jurisdiction of such courts; (b) consents to service of process; (c) consents to venue; and (d) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction, service of process, or venue. The parties hereto further agree that the state and federal courts of the State of Florida are convenient forums for any dispute that may arise herefrom and that neither party shall raise as a defense that such courts are not convenient forums.

11.    **Entire Agreement; Survival.** This Agreement embodies the entire and final agreement of the parties on the subject matter stated in this Agreement. No amendment or modification of this Agreement shall be valid or binding upon the Bank or the Employee unless made in writing and signed by all parties. Any and all prior understandings and agreements relating to the subject matter of this Agreement are hereby expressly terminated. The provisions of this Agreement that contemplate post-employment obligations, whether on the part of the Bank or the Employee, or any combination, shall survive any termination of this Agreement.

12.    <u>**Section 409A.**</u>  This Agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements of Section 409A of the Code and applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder (and any applicable transition relief under Section 409A of the Code). Nevertheless, the tax treatment of the benefits provided under the Agreement is not warranted or guaranteed.  Neither the Bank nor its directors, officers, employees, or advisers shall be held liable for any taxes, interest, penalties, or other monetary amounts owed by the Employee as a result of the application of Section 409A of the Code. To the extent applicable, each payment of severance benefits under this Agreement shall be considered a separate payment, as described in Treas. Reg. Section 1.409A-2(b)(2), for purposes of Section 409A of the Code.  Whenever in this Agreement a payment or benefit is conditioned on the Employee's execution of a release of claims, such release must be executed and all revocation periods shall have expired within sixty (60) days after the Employee's termination of employment, failing which such payment or benefit shall be forfeited.  To the extent necessary to comply with or be exempt from Section 409A of the Code, (a) termination of employment shall be construed consistent with a "separation from service" under Section 409A of the Code, and (b) any amounts payable under this Agreement that qualify as exempt separation pay under Section 409A of the Code shall be deemed to be the amounts payable earliest in time.

13.    <u>**Code Section 280G.**</u>

(a)  Notwithstanding anything in this Agreement to the contrary, in the event it shall be determined that any payment or distribution by the Bank to or for the benefit of Employee (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise) (such benefits, payments or distributions are hereinafter referred to as "Payments") would, if paid, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then the Payments shall be limited to the extent necessary to avoid being subject to the Excise Tax (the "Reduced Amount"). The reduction of the Payments due hereunder, if applicable, shall be made by first reducing cash Payments and then, to the extent necessary, reducing those Payments having the next highest ratio of Parachute Value to actual present value of such Payments as of the date such Payments become due, as determined by the Determination Firm (as defined in Section 13(b) below). For purposes of this Section 13, present value shall be determined in accordance with Section 280G(d)(4) of the Code. For purposes of this Section 13, the "Parachute Value" of a Payment means the present value as of the date such Payment becomes due of the portion of such Payment that constitutes a "parachute payment" under Section 280G(b)(2) of the Code, as determined by the Determination Firm for purposes of determining whether and to what extent the Excise Tax will apply to such Payment.

(b)  All determinations required to be made under this Section 13, including whether an Excise Tax would otherwise be imposed, whether the Payments shall be reduced, the amount of the Reduced Amount, and the assumptions to be utilized in arriving at such determinations, shall be made by an accounting firm or compensation consulting firm selected by the Bank (the "Determination Firm") which shall provide detailed supporting calculations both to the Bank and the Employee within 15 business days after the receipt of notice from the Employee that a Payment is due to be made, or such earlier time as is requested by the Bank. All fees and expenses of the Determination Firm shall be borne solely by the Bank. Any determination by the Determination Firm shall be binding upon the Bank and the Employee.  As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Determination Firm hereunder, it is possible that Payments which the Employee was entitled to, but did not receive pursuant to Section 13, could have been made without the imposition of the Excise Tax ("Underpayment"), consistent with the calculations required to be made hereunder. In such event, the Determination Firm shall determine the amount of the Underpayment that has occurred and

11

any such Underpayment shall be promptly paid by the Bank to or for the benefit of the Employee but no later than March 15 of the year after the year in which the Underpayment is determined to exist, which is when the legally binding right to such Underpayment arises.

(c)    In the event that the provisions of Code Section 280G and 4999 or any successor provisions are repealed without succession, this Section 13 shall be of no further force or effect.

**14.    Attorneys' Fees.**  In the event litigation ensues between the parties concerning the terms of this Agreement or any other aspect of the employment relationship among the parties, the party(s) prevailing in such litigation shall be entitled to receive from the other party(s) all reasonable costs and expenses, including without limitation attorneys' fees, incurred by the prevailing party(s) in connection with such litigation, and the other party(s) shall pay such costs and expenses to the prevailing party(s) promptly upon demand by the prevailing party(s); provided, however, that demand by the prevailing party shall be made no more than thirty (30) days following the final resolution of such litigation and the other party shall pay such costs and expenses to the prevailing party by the fifteenth (15th) day of the third (3rd) month following the final resolution of such litigation.

**15.    Definitions.**  Whenever used in this Agreement, the following terms and their variant forms shall have the meanings set forth below:

(a)    "*Affiliate*" shall mean any entity which controls, is controlled by, or is under common control with another entity. For this purpose, "control" means ownership of more than fifty percent (50%) of the ordinary voting power of the outstanding equity securities of an entity.

(b)    "*Business*" means engaging in the business of community banking and commercial banking, including, without limitation, originating, underwriting, closing and selling loans, receiving deposits and otherwise engaging in the business of banking, as well as the business of providing any other activities, products, or services of the type conducted, authorized, offered, or provided by the Bank as of the date of Employee's termination of employment, or during the two (2) years immediately prior to the date of Employee's termination of employment.

(c)    "*Cause*" shall mean:

(i)    a material breach of the terms of this Agreement by the Employee, including, without limitation, the Employee's material and substantial failure, in the Board's reasonable judgment, to perform the Employee's duties and responsibilities in the manner and to the extent required under this Agreement, or the Employee's material and substantial failure, in the Board's reasonable judgment, to follow the reasonable and lawful directions of the Board, which in any event results or is reasonably likely to result in material harm to the Bank;

(ii)    any act by the Employee of fraud against, material misappropriation from, or material dishonesty to the Bank or any Affiliate;

(iii)    conviction of the Employee of a crime involving breach of trust or moral turpitude or any felony;

(iv)    conduct by the Employee that amounts to willful misconduct, gross and willful insubordination, gross neglect or inattention to or material failure to perform the Employee's duties and responsibilities hereunder, including prolonged absences without

the written consent of the Board, which results or is reasonably likely to result in material harm to the Bank ;

(v)     any breach of the Employee's obligations under Section 5;

(vi)     any material violation of the Bank's policies or guidelines of employment or corporate governance policies or guidelines, including, without limitation, any code of conduct, as the same may be in force from time to time, which results or is reasonably likely to result in material harm to the Bank ;

(vii)     receipt of any form of notice, written or otherwise, that any regulatory agency having jurisdiction over the Bank intends to institute any form of formal or informal regulatory action against the Employee; or

(viii)     the Employee's removal and/or permanent prohibition from participating in the conduct of the Bank's affairs by an order issued under Section 8(e)(4) or 8(g)(1) of the FDIA (12 U.S.C. 1818(e)(4) and (g)(1));

provided that the nature of any conduct or event constituting Cause shall be set forth with reasonable particularity in a written notice to the Employee.

(d)     "*Change in Control*" shall mean any transaction, whether by merger, consolidation, asset sale, recapitalization, reorganization, combination, stock purchase, tender offer, reverse stock split, or otherwise, which results in the acquisition of, or beneficial ownership (as such term is defined under rules and regulations promulgated under the Securities Exchange Act of 1934, as amended) by any entity, person or any group thereof acting in concert, of 50% or more of the outstanding shares of common stock of the Bank or its parent holding company; or the sale of all or substantially all of the assets of the Bank or its parent bank holding company.

(e)     "*Confidential Information*" means any and all data and information relating to the Bank or any Affiliate, its activities, business, or clients that (i) is disclosed to the Employee or of which the Employee becomes aware as a consequence of Employee's employment with the Bank; (ii) has value to the Bank or any Affiliate; and (iii) is not generally known outside of the Bank. Confidential Information shall include, but is not limited to the following types of information regarding, related to, or concerning the Bank or any Affiliate: trade secrets (as defined by Section 688.002 of the Florida Uniform Trade Secrets Act); financial plans and data; management planning information; business plans; operational methods; market studies; marketing plans or strategies; pricing information; product development techniques or plans; customer lists; customer files, data and financial information; details of customer contracts; current and anticipated customer requirements; identifying and other information pertaining to business referral sources; past, current and planned research and development; computer aided systems, software, strategies and programs; business acquisition plans; management organization and related information (including, without limitation, data and other information concerning the compensation and benefits paid to officers, directors, employees and management); personnel and compensation policies; new personnel acquisition plans; and other similar information. Confidential Information also includes combinations of information or materials which individually may be generally known outside of the Bank, but for which the nature, method, or procedure for combining such information or materials is not generally known outside of the Bank. In addition to data and information relating to the Bank or any Affiliate, Confidential Information also includes any and all data and information relating to or concerning a third party that otherwise meets the definition set forth above, that was provided or made available to the Bank or any Affiliate by such third party, and

13

that the Bank has a duty or obligation to keep confidential. This definition shall not limit any definition of "confidential information" or any equivalent term under state or federal law. Confidential Information shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege of the Bank or any Affiliate.

(f)     "*Disability*" or "*Disabled*" shall mean that the Employee (a) is, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Bank, or (b) is determined to be totally disabled by the Social Security Administration.

(g)     "*Good Reason*" means, without the Employee's written consent: (i) a reduction of Employee's Annual Base Salary or a diminution of the maximum amount of Employee's annual bonus opportunity; (ii) a material change in the geographic location from where Employee substantially performs duties and services under this Agreement, which includes any relocation that increases the Employee's commute by thirty (30) miles or more; (iii) any action taken by the Bank which results in a material reduction in the Employee's authority, duties or responsibilities, (iv) the assignment to the Employee of duties that are materially inconsistent with the Employee's authority, duties or responsibilities, or (v) a material breach of the terms of this Agreement by the Bank. Employee must provide written notice to the Bank of the existence of a condition described above within ninety (90) days of the initial existence of the condition and the Bank shall have thirty (30) days to remedy the condition. Employee must actually terminate employment within one hundred eighty (180) days after the first occurrence of the applicable grounds for Good Reason before the Bank is required to pay severance under Section 4.2(b) of this Agreement, or Employee will be deemed to have waived Employee's legal right to terminate for Good Reason with respect to such grounds.

(h)     "*Invention*" means any discovery, process, formula, method, compound, composition of matter, technique, development, improvement, design, schematic, device, concept, system, technical information, or know-how, whether patentable or not, and any and all patent rights therein, whether now or hereafter perfected and reduced to practice.

(i)     "*Material Contact*" means contact between the Employee and a customer or potential customer of the Bank or any Affiliate (i) with whom or which the Employee has or had dealings on behalf of the Bank or any Affiliate; (ii) whose dealings with the Bank are or were coordinated or supervised by Employee; (iii) about whom the Employee obtains Confidential Information in the ordinary course of business as a result of Employee's employment with the Bank; or (iv) who receives products or services of the Bank or any Affiliate, the sale or provision of which results or resulted in compensation, commissions, or earnings for the Employee within the two (2) years prior to the date of Employee's termination of employment.

(j)     "*Intellectual Property Rights*" means all intellectual property rights worldwide arising under statutory or common law or by contract and whether or not perfected, pending, now existing or hereafter filed, issued, or acquired, including all (i) patent rights; (ii) rights associated with works of authorship including copyrights and mask work rights; (iii) rights relating to the protection of trade secrets and confidential information; (iv) trademarks, service marks, trade dress, and trade names; and (v) any right analogous to those set forth herein and any other proprietary rights relating to intangible property.

kj) "*Protected Customer*" means any person to whom the Bank or any Affiliate has sold its products or services or actively solicited to sell its products or services within the ninety (90) day period preceding the conduct in question (if the conduct occurs while Employee is still employed by the Bank) or within the ninety (90) day period preceding the date of Employee's termination of employment (if the conduct occurs after Employee's Termination), as applicable, and with whom the Employee has had Material Contact on behalf of the Bank during Employee's employment with the Bank.

(l) "*Protected Work*" means any and all ideas, Inventions, Works, hardware systems, logos, trade dress, trademarks, service marks, brand names, and trade names (i) conceived, produced or used or intended for use by or on behalf of the Bank or any Affiliate or its customers or (ii) conceived, developed or produced by the Employee after the Employee leaves the employ of the Bank that relates to or is based on Confidential Information to which the Employee had access by virtue of Employee's employment with the Bank.

(m) "*Restrictive Covenants*" means the restrictive covenants contained in Section 5 hereof.

(n) "*Works*" means any works of authorship, compilations, documents, data, notes, designs, photographs, artwork, drawings, visual or aural works, data bases, computer programs, software (source code and object code), systems, programs, software integration techniques, schematics, flow charts, studies, research, findings, manuals, pamphlets, instructional and training materials, and other materials, including, without limitation, any modifications or improvements thereto or derivatives therefrom, and whether or not subject to copyright or trade secret protection.

**16.** **Mitigation.** The Employee shall not be required to mitigate the amount of any payment the Bank becomes obligated to make to the Employee in connection with this Agreement by seeking other employment or otherwise. The amount of any payment provided for in Section 4.2(b) shall not be reduced, offset or subject to recovery by the Bank by reason of any compensation earned by the Employee as the result of employment by another employer after the termination of employment or otherwise.

*[signature page follows]*

**IN WITNESS WHEREOF,** the Bank and the Employee have executed and delivered this Agreement as of the date first shown above.

FIRST NATIONAL BANK OF PASCO

By:  _____

Ander P. Gibbs, Chairman

EMPLOYEE:

_____
John Zazzera

**EXHIBIT B**



January 2, 2025

Paul Ciccotto
Via Email

Dear Paul,

I am pleased to offer you a three-year employment agreement for the position of EVP, Chief Administration Officer* at First National Bank of Pasco. Your starting salary will be $250,000 less applicable taxes, paid bi-weekly. In 2025, you will be guaranteed a minimum bonus payment of $45,000 annually, as long as you are on the payroll and in good standing with the bank. Additionally, when constructed, you will participate in the Leadership Incentive Plan as approved by the Board of Directors.  Your start date will be determined based on your availability.

As part of the First National Bank of Pasco Executive Team, you will be eligible to participate in a wide array of benefits such as:

- 100% company paid Health Plan – Options include Medical, Dental & Vision— effective the first day of the month following the first day of employment.
- 100% company paid Life Insurance, AD&D, short term disability and long-term disability – effective the 1st day of the month following the first day of employment.
- 401K – you will be eligible to participate in the company sponsored 401k plan following three (3) months of employment.
- Vacation & Holidays – You will be eligible for twenty days of paid vacation annually. You are immediately eligible for seven sick leave days per year, and for 11 company-observed holidays. You are also eligible for two personal days per year, which will be prorated based on hire date.

Our offer of employment is contingent upon a satisfactory background and credit check, drug screen, and by providing documentation establishing your employment authorization and identity.

The additional terms of your employment with First National Bank of Pasco are defined in your change in control agreement. Please refer to that document for all the details. If your employment is terminated for cause (as defined in the change in control agreement) all agreements will be void. If this offer is acceptable to you, please indicate by signing below before close of business on January 15, 2025.

Should you have any questions, please do not hesitate to contact me. Paul, we're looking forward to working with you and welcoming you to First National Bank of Pasco.

Sincerely,                                                            Accepted by:

John Zazzera                                                         Paul Ciccotto            Date
President & CEO

*Title subject to approval by the Board of Directors

13315 U.S. Highway 301, Dade City, FL  33525

**Official Bank of the American Dream**

### First National Bank of Pasco.
### Executive Change in Control Severance Agreement

This change in control agreement ("agreement") is made and entered into by and between Paul Ciccotto ("Executive") and First National Bank of Pasco (the "Bank") This agreement is affective as of December 30, 2024.

The Bank desires to provide for the payment of severance in connection with certain terminations of Executive's employment with the Bank that occur in connection with a change in control.

If First National Bank of Pasco undergoes a change in control[1] resulting in the elimination of your position and your employment is terminated, you will be entitled to the following severance payment:

If the Bank is sold within 1–24 months of your employment start date, you will be eligible for severance equal to 36 months of pay at your regular monthly pay rate (i.e., $250,000 divided by 12 months, or $20,833 per month), minus the number of months employed after your start date. For example, if a change in control occurs 12 months after your start date and your employment is terminated  as a result, you would be eligible for 24 months of severance.

If a change in control occurs within 25–36 months of your employment start date, you will be eligible for severance equal to 12 months of pay at your regular monthly pay rate (i.e., $250,000 divided by 12 months, or $20,833 per month).

As part of your severance, you will also receive any and all benefits accrued under any Bank incentive or welfare plans up to the date of termination of employment. The amount, form, and timing of payment for such benefits will be determined in accordance with the terms of the respective plans.

Any required severance will be paid within sixty (60) days of termination of your employment. No severance will be due if, after a change in control, your employment is terminated for "cause."[2]

---

[1] For purposes of this agreement, a "change in control" shall mean any transaction, whether by merger, consolidation, asset sale, recapitalization, reorganization, combination, stock purchase, tender offer, reverse stock split, or otherwise, which results in the acquisition of, or beneficial ownership (as such term is defined under rules and regulations promulgated under the Securities Exchange Act of 1934, as amended) by any entity, person or any group thereof acting in concert, of 50% or more of the outstanding shares of common stock of the Bank or its parent holding company; or the sale of all or substantially all of the assets of the Bank or its parent bank holding company.

[2] For purposes of this agreement, "cause" shall mean: (i) the Executive's material and substantial failure, in the Bank's reasonable judgment, to perform the Executive's duties and responsibilities, or the Executive's material and substantial failure, in the Bank's reasonable judgment, to follow reasonable and lawful direction, which in any event results or is reasonably likely to result in material harm to the Bank; (ii) any act by the Executive of fraud against, material misappropriation from, or material dishonesty to the Bank or

13315 US-301, Dade City, FL 33525
FNBPasco.com

No severance will be owed should a change in control occur more than three years after you begin employment.

In the event of your death following a change in control and your termination, but before payment of any severance due under this offer, the Bank will pay to your estate any severance amounts due you pursuant to this offer.

Any severance obligation under this offer shall be entirely unfunded and the Bank shall not segregate any assets to pay any amounts due hereunder. Neither you nor your spouse or other beneficiary shall have any interest in or rights against any specific assets of the Bank, and you, your spouse or other beneficiary shall have only the rights of general unsecured creditor of the Bank.

If the Executive voluntarily terminations his employment with the Bank, he will not be entitled to any severance provisions outlined in this document.

The receipt of any severance or other benefits pursuant to this agreement will be subject to Executive signing and not revoking a general release of all claims in a form provided by the Bank, and such release becoming effective and irrevocable no later than the forty-fifth (45th) day following Executive's termination (such deadline, the "Release Deadline"). No severance or other benefits will be paid or provided pursuant to this Agreement until the release becomes effective and irrevocable. If the release does not become effective and irrevocable by the Release Deadline, Executive will forfeit all rights to severance payments and benefits under this Agreement.

Each of the parties has executed this Agreement, in the case of the Bank by its duly authorized officer as signed below:

Executive:                                              For First National Bank of Pasco

_____                    _____
Paul Ciccotto                                          John Zazzera

Date: _1 - 7 - 2025___                           Date: _1 - 7 - 2025___

---

any of its affiliates; (iii) conviction of the Executive of a crime involving breach of trust or moral turpitude or any felony; (iv) conduct by the Executive that amounts to willful misconduct, gross and willful insubordination, gross neglect or inattention to or material failure to perform the Executive's duties, including prolonged absences without the written consent of the Bank, which results or is reasonably likely to result in material harm to the Bank; (v) any material violation of the Bank's policies or guidelines of employment or corporate governance policies or guidelines, including, without limitation, any code of conduct, as the same may be in force from time to time, which results or is reasonably likely to result in material harm to the Bank; (vi) receipt of any form of notice, written or otherwise, that any regulatory agency having jurisdiction over the Bank intends to institute any form of formal or informal regulatory action against the Executive; or (vii) the Executive's removal and/or permanent prohibition from participating in the conduct of the Bank's affairs by an order issued under Section 8(e)(4) or 8(g)(1) of the FDIA (12 U.S.C. 1818(e)(4) and (g)(1)).

13315 US-301, Dade City, FL 33525
FNBPasco.com

**EXHIBIT C**



January 10, 2025

Raamie Ibrahim
Via Email

Dear Raamie,

First National Bank of Pasco is delighted to offer you the full-time position of SVP, Product and Delivery with an anticipated start date of January 27, 2025, contingent upon a satisfactory background and credit check, drug screen, and by providing documentation establishing your employment authorization and identity. Your starting salary will be $175,000 less applicable taxes, paid bi-weekly. Additionally, when constructed, you will participate in the Leadership Incentive Plan as approved by the Board of Directors.

As part of the First National Bank of Pasco Executive Team, you will be eligible to participate in a wide array of benefits such as:

- 100% company paid Health Plan – Options include Medical, Dental & Vision— effective the first day of the month following the first day of employment.
- 100% company paid Life Insurance, AD&D, short term disability and long-term disability – effective the 1st day of the month following the first day of employment.
- 401K – you will be eligible to participate in the company sponsored 401k plan following three (3) months of employment.
- Vacation & Holidays – You will be eligible for twenty days of paid vacation annually. You are immediately eligible for seven sick leave days per year, and for 11 company-observed holidays. You are also eligible for two personal days per year, which will be prorated based on hire date.

If this offer is acceptable to you, please indicate by signing below and returning it to me by email before close of business on January 15, 2025.

Should you have any questions, please do not hesitate to contact me. Raamie, we're looking forward to working with you and welcoming you to First National Bank of Pasco.

Sincerely,

*Paul Ciccotto*

Paul S. Ciccotto
EVP - Chief Administrative Officer


Raamie Ibrahim (Jan 10, 2025 14:54 CST)
_____          _____
Signature                                    Date

Raamie Ibrahim


13315 U.S. Highway 301, Dade City, FL 33525

# Raamie Ibrahim Offer Letter 1.10.25

**Final Audit Report** 2025-01-10

| | |
|---|---|
| Created: | 2025-01-10 |
| By: | Paul Ciccotto (pciccotto@fnbpasco.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQWu_mEfmE0hspmy28QZq0uHGDK3mmIAF |

## "Raamie Ibrahim Offer Letter 1.10.25" History

Document created by Paul Ciccotto (pciccotto@fnbpasco.com)
2025-01-10 - 8:41:55 PM GMT

Document e-signed by Paul Ciccotto (pciccotto@fnbpasco.com)
Signature Date: 2025-01-10 - 8:49:21 PM GMT - Time Source: server

Document emailed to raamie84@gmail.com for signature
2025-01-10 - 8:49:22 PM GMT

Email viewed by raamie84@gmail.com
2025-01-10 - 8:52:33 PM GMT

Signer raamie84@gmail.com entered name at signing as Raamie Ibrahim
2025-01-10 - 8:54:20 PM GMT

Document e-signed by Raamie Ibrahim (raamie84@gmail.com)
Signature Date: 2025-01-10 - 8:54:22 PM GMT - Time Source: server

Agreement completed.
2025-01-10 - 8:54:22 PM GMT

**Adobe Acrobat Sign**